MARY C. PARKER.

v.

CHARLES H. PARKER.

[Filed January 11th, 1899.]

1. On a bill for alimony, under section 20 of the Divorce act, there must be both abandonment and refusal of support to justify a decree.

2. Where the husband unjustly and untruthfully accused his wife of unfaithfulness to him, and frequently told her that she might go to her own home if she did not like his proceedings, and finally struck her a blow in the face, in anger, and with such force as to injure her eyesight, she was justified in separating from him, and this was an abandonment by him under the statute.

3. Where the husband has for years refused and failed to support his wife and child, and they have lived apart from him, and he definitely rejects, without cause, the wife's personal appeal to him for a reunion, such a rejection is an abandonment by the husband of his wife, within the meaning of the statute.

4. After suit brought because of such abandonment and refusal of support, a formal invitation by the husband to the wife to return to his house, unaccompanied by any evidence whatever of a purpose to treat her with justice and consideration, and while he yet continues to refuse even to speak to her, so that she fears to return to him, will not relieve him from the consequence of his abandonment and refusal to support her.

On bill for alimony, answer and proofs.

Mr. Jonathan W. Acton, for the complainant.

Mr. William T. Hilliard, for the defendant.

37

GREY, V. C.

The bill in this case is filed by the complainant wife to compel her husband, the defendant, to support her. An order was made shortly after the bill was filed, directing the payment of alimony until the husband should in a proper manner give the complainant a suitable home in accordance with his legal obligation, &c. He refused to pay any alimony, claiming that he has been at all times ready and anxious to have her live with him in a suitable home, and on this issue much the greater part of the testimony was taken. After each side had thus exposed his or her whole case to the other, it was agreed that the testimony already taken should be read as if received, and the case heard, on final hearing. An answer was then filed by the defendant, and very little more testimony was taken at the hearing.

The relief sought is under section 20 of the Divorce act. *Gen. Stat. p. 1270.* By virtue of this act, support may be decreed when it appears that the husband has both abandoned the wife and refused to support her.

There is no question whatever in this case that the husband has for years refused to support his wife and child. He admits it and claims to justify his refusal by insisting that he did not abandon his wife, but that she separated herself from him without cause. The attention of the litigants has been given solely to the maintenance or overthrow of the claim that the husband did, in the consideration of a court of equity, abandon his wife.

When the husband so deals with the wife that she is compelled to leave him because of his cruel treatment, their separation will be deemed, in the view of this court, an abandonment by him. *Maas v. Maas, 7 Stew. Eq. 113.* And even if she without justification leave him, but seeks to return to him, and he refuses to receive her, this is such abandonment by him as to justify the enforcement of the statute, although the husband does give her partial support. *Cory v. Cory, 3 Stock. 402; Anshutz v. Anshutz, 1 C. E. Gr. 165.*

To ascertain the relations of the parties in this case a summary review of the pleadings and evidence in the cause is necessary.

Parker *v.* Parker.

The parties were married in August of the year 1890. They resided for a short time in Philadelphia, and in September, 1890, moved to Salem, New Jersey, and lived there, and have continued to live in the State of New Jersey ever since. Shortly after their marriage they resided for a time with the parents of the complainant. In February, 1892, a child was born to them, and while the child was yet a few weeks old the husband left the wife and went elsewhere in the city of Salem to board, living apart from her for several months. The complainant followed him when her child was about two months old and went to live with him at the place where he boarded, and shortly after this the defendant purchased a house of his own and the parties began housekeeping. In 1892 the complainant was taken ill while in her mother's house. A day or two afterwards, when she had somewhat recovered, she returned to her husband's house, and on the day of her arrival he desired to have his supper prepared, and became very angry at the delay or disregard of his request, and in the course of a quarrel which arose from his remarks either to the servant girl or to the wife, he struck his wife across the face with his open hand (while she was carrying the baby in her arms), as he admits in anger, and with such force that for a long while afterwards her eyesight was injured. She alleges, and I think proves, that he had frequently used harsh and violent language to her, and that he threatened her with violence, and told her if she did not like his proceedings, to get out of his house, and that in consequence of this harsh usage, on receiving the blow in the face she fled with her child to the home of her brother, where she has since remained. She states that she has frequently applied to her husband to take her to his home and treat her with the consideration due a wife. She took her child and went back, seeking to live with him, in October, 1892, and he told her to go home. This was at ten or eleven o'clock at night. He has refused to provide for her or to receive her, or to provide for their child.

The defendant is a glassblower, in receipt of large weekly wages, and owns a house and lot in the city of Salem, but ever since October, 1892, when he struck his wife in the face and she

left his house, he has made no provision whatever for her or for the child. The expense of her living for both herself and her child has been defrayed by her brother; and when she .applied to her husband for assistance he has told her that she could go to her brother for help.

The defendant, by his answer, states the quarrel, when he struck her, to have resulted from his wife rebuking him for reproving the servant for delay in getting his supper, and that he struck her because she aggravatingly dared him to do so. He admits that he has refused to provide for her or her child unless they come to live with him, and denies that he is under any obligation to provide for them elsewhere, but states that he is willing and able to provide for them at his own house. He states that since the time when she went to her brother in 1892, she has frequently met him on the streets and taken long walks to secluded parts of the suburbs of the town with him, and has frequently permitted him to have sexual intercourse with her, and has come to his house and passed the night in the same bed with him; and he states that she, at his solicitation, has promised to come and stay with him, but has broken her word, stating that her parents were opposed to her coming back and living with the defendant; that, disappointed and enraged at her duplicity, he finally wrote her a letter in which he stated he would never live with her again, which letter, he states, was not an exponent of his real feeling, as he has always been ready to have his wife return to him, never desiring her to leave his house, and now has a good home for her to live in, which he desires she shall share with him.

That the husband struck the wife in the face in anger is admitted by him, and evidence as to the blow is given by the wife and her brother. The violence of the husband appears to have been the culmination of harsh treatment which was habitually used toward the wife, even when she was sick and weak, and it produced a continuing condition of fear of her husband. After their separation, because of this treatment, the wife kept her permanent home with her parents or her brother; she occasionally visited her husband's house, but only for very short periods,

---

---

a day or a night, and she never recovered from her fear of him. This continued up to the year 1895, when their relations appear to have ceased.   The defendant is shown to have been entirely willing to have such relations with his wife as enabled him to enjoy all the privileges of a husband.   He subjected her to the probable dangers which attend upon maternity, but the responsibilities of maintenance of the wife and of his child, which the law casts upon him, and which he was well able to undertake, he declined to assume, and compelled her to depend on her own family.   Her statement that her approaches to him were made in the hope that she might win back his affections, and that it was for this reason that she received him as her husband, I think is consistent with the weight of the evidence, and her conduct in this respect was proper and right.

He claims to explain and justify his refusal to support his wife and child by asserting that he has been desirous that she should live with him and always had his house open to her, but she refused to come to his house, and he was not willing to support her elsewhere.   The husband's testimony alone attempts to show that the issue between these parties turned upon the question whether the wife should live in his house, or as to the place where they should live together.   Their difference and separation was occasioned by the husband's cruel conduct.   There is no proof whatever that he afterwards sought to regain his wife's confidence, save his unsupported assertions, which do not accord with his admitted actions.   From the time of the separation, because of his violence, the efforts for a reunion were made on the part of the wife—she sought him out, she allowed to him a husband's privileges up to the year 1895, but does not appear to have regained his affections.

The testimony not only of the wife but of the husband himself shows that his treatment of his wife was harsh and cruel, such as might inspire in her at times of sickness and of weakness (which in her case were quite frequent) a fear of actual physical violence.   He never expressed any regret for his unmanly blow.   In response to her frequent demands for support, he as frequently refused her, and seemed to be entirely willing

that her maintenance should be furnished by her own family. He sends her a letter through the mail, addressing her as "Miss Ludwick," her maiden name, and by his own statements appears to have treated her with contempt and disdain.

His letter of May 18th, 1896, sent just before the bill was filed in this case, is expository of the true relations of the parties. They had separated in 1892, because of his cruelty to his wife. Though weak in health, and having the sole care of their child, and obliged to live upon the bounty of her family, she had endeavored up to 1895 to bring about a renewal of kind feelings, but she failed.

In May, 1896, their child, Florence, became sick. The testimony of the defendant narrates the circumstances under which he and his wife had an interview which led to the letters of that month. The defendant swears that, at the wife's request, he called twice to see their sick child, who, with the wife, was living at her father's house. He testifies that she " used me all right the first time. She asked me to come again to tea in the evening." He refused to come to tea, but came in the evening. The complainant doubtless deemed this to be a favorable time to appeal to his better nature. As he was leaving, she approached him, asking for a reconciliation. His own account of his conduct is—

"I took my hand and pushed her away from me, and told her that this was no time to ask for a reconciliation ; that people were saying some hard things about her in town ; that as soon as Florence got well, her and I would have a talk."

He then left .the house. By this mention of " hard things " said about the complainant, he referred to an accusation of unfaithful conduct on her part. He admits that the only foundation for this cruel charge was the casual statement of a man named Vanneman, that he had seen the complainant riding along the street in a carriage with another man. It may be said once and for all that there is no shadow of proof of any misconduct on the part of the wife. She appears to have been a true and faithful wife at all times. He further testifies that shortly after

Parker v. Parker.

this interview she wrote him a letter denying his accusations, intimating that he had himself been unfaithful to his marriage vows, and that legal proceedings might be taken to enforce recognition of her marital rights. On receiving this note, he naturally supposed she was about to sue for a divorce. This was evidently just what he wanted, and his letter of May 18th, 1896, written in reply, shows that his previous conduct had been by him adjusted with the hope and expectation of bringing about this result. In this reply of May 18th, 1896, referring to the interviews when his wife asked for a reconciliation, he writes her : "This is what I did say—you asked me for a reconciliation, and I told you no, that I only came to help you out of this trouble; that I could never live with you again." And again, "Now you know my intention, that I will never live with you again, so proceed with your case." And again, "You will do me a favor if you will proceed with the case this week." He offers, if she has not proofs enough to make a case, *to give her some more which he saw himself.* The letter, in its other terms, is indicative of the entire absence of any feeling of love, or even of kindly regard on the part of the writer towards the person to whom it was sent. Shortly after this letter was received, the complainant filed her bill in this cause, not for a divorce, but for alimony.

I think there can be no question that the attitude of the defendant at this time was that of a husband who had not only for years refused to support his wife, but who had, in the most explicit and insulting terms, declared his abandonment of her, and that she was entirely justified in filing her bill in this cause under the principles declared in the cases above cited.

The defendant, in his answer, seeks to explain away the effect of the above-quoted letter by alleging that he wrote it because disappointed at the failure of his efforts to induce the wife to return and while enraged at her duplicity and cruelty to him ; that it was written in anger and was not expressive of his real feelings towards her. There is not a word of proof, even in his own testimony, which attempts to sustain this explanation of this brutal letter, written by a husband to a wife just after she

had sought a renewal of kindly feelings. So far from being written because of failure to induce her to return, his own testimony proves that, shortly before writing this letter, he had rejected her appeal to him for a reconciliation, rudely pushing her away from him, almost at the bedside of their sick child. The duplicity and cruelty in the matter appear to have been wholly on the part of the defendant himself, and to be so obvious that they throw a shadow of doubt over all of his testimony, which is contradicted by the other witnesses.

The filing of this bill made it apparent to the defendant that he was not, by this proceeding, to be enabled to escape from his obligation to support his wife by means of a divorce, but that its purpose was to compel him by law to maintain her as his wife without freeing him from his marriage contract.

Shortly after this bill was filed, not for divorce but to compel support, the professions and declarations of the defendant immediately and radically changed. This man, who for years had treated his wife with contempt and refused to support either her or his child by her, who had struck her in the face, who within three months had tendered himself ready to aid her in proceedings for divorce with proofs of what he had seen of his own misconduct, now makes formal tender of his desire that she should come home as mistress of his house. He uses language, also, which is utterly unlike his previous writing, and which, as expressed, exactly meets his legal duty and plainly indicates (though he denies it) that he is writing and speaking under the suggestion of his counsel as to what is necessary for him to do to avoid a compulsory order for alimony. He admits that, under advice, he has kept a copy of his formal written offer, so that it is difficult to believe him when he testifies that it was not written under like advice. This is the outward and visible profession which the defendant makes, but what sincerity there is in those offers and his real feelings towards the complainant, is fairly indicated by the fact that he yet justifies his previous ill treatment; that he still does nothing for the support of his wife and his child; that, except a short conversation in a lawyer's office since this suit was brought, he has not spoken to his

Parker *v.* Parker.

wife for years and does not now speak to her when they meet. It is not to be wondered at that she fears to accept his formal tender of her marital rights, and wants, as she testifies, to have time to see by his acts and conversation whether he "will do right by her" if she will go back. He has given no evidence whatever that he has any kindly feeling for her. He simply makes a formal proffer to do his legal duty.

Of what sort of a house would she be mistress should she accept his offer? She must live with a man who but a few months before had made to her, in his own handwriting, a most insulting proposal to furnish proof of his treachery to his marriage vows, who had treated her with constant disdain and finally with such actual cruelty that she is yet afraid to live with him, and who has never in any way expressed the slightest regret for his evil conduct—indeed yet proves the existence of his own contempt for her and its continuance by persistently refusing to speak to her.

She testifies that she is afraid to go—that she fears that she will receive the same treatment to which she was formerly subjected. So far as words are concerned, when it was made apparent to the husband that it was intended to force him by law to support his wife and child, there is a profession of willingness to perform that duty. But his refusal to speak to his wife and to treat her with that consideration which might make her acceptance of his formal proposition an endurable association with her husband, show that his conduct is insincere and deceitful, as his feeling towards her is unkind, at the very time he is making these professions of his willingness and desire that she should return to him. It is quite evident that his offer to receive her into his home as the mistress of his house is a mere pretence to avoid the making of a mandatory order upon him to maintain her.

I am compelled to believe that these declarations of willingness to perform his marital duties, on the part of the defendant, are of the same class as those commented upon in the case of *Elliott* v. *Elliott, 3 Dick. Ch. Rep. 238,* as follows: "While the law regards a sincere and honest desire, on the part of the hus-

Parker v. Parker.

band, to put an end to an unfortunate separation between himself and his wife with favor, and as tending to relieve him from responsibilities the law might otherwise impose upon him, it cannot give such effect to the simple declaration of a defendant in a suit already commenced, without any manifestations by act or effort that his proposition is sincere, or made with the expectation of having it accepted. Less weight is to be given to such declaration of a party as a witness in the trial of the suit to make him liable for separation, which has not been preceded or is not accompanied or followed by any practical manifestations of sincerity."

I am myself unable to accept the testimony of the husband and his offers to receive his wife, as sincerely made, with intention to accord to her her proper place. They appear to me (given out as they are, after this suit was commenced, and without any manifestations on his part accompanying them that his proposition is sincere and expressive of a true purpose) to be made simply to avoid the imperative effect of an order for maintenance in this case.

The proofs show that the defendant is the owner of a house and lot, and that he has the capacity to earn large wages—$20 per week or more—during a large portion of the year.

I will advise a decree that an allowance of $8 per week be made for the support and maintenance of the wife and their child until the further order of the court; that the defendant give security in the sum of $500 for such support and maintenance, and that a counsel fee of $40 in all be allowed the counsel for the complainant, and that the defendant pay the costs of suit.